UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

                              :

MADELEYNE GUERRERO,                   :

                              :

                  Plaintiff,    :

           v.               :

                              :

CAROLYN COLVIN,                   :

*Acting Commissioner of Social Security*,  :

                              :

               Defendant. :

                              :

------------------------------------------------------ X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>September 29, 2016</u> |

15 Civ. 1211 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Madeleyne Guerrero ("Plaintiff") filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security (the "Commissioner" or "Defendant") that denied Plaintiff's applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties have filed cross-motions for judgment on the pleadings. For the reasons set forth in the remainder of this Opinion, Plaintiff's motion is granted and Defendant's motion is denied.

## BACKGROUND[1]

Plaintiff filed applications for DIB and SSI on June 11, 2012,[2] alleging that she has been disabled since June 28, 2011.  (SSA Rec. 116-37).  The Commissioner denied Plaintiff's applications on August 10, 2012.  (*Id.* at 54).  Plaintiff timely requested a hearing before an Administrative Law Judge (the "ALJ"), pursuant to 20 C.F.R. § 404.929.  (*Id.* at 60).  A hearing was held on July 23, 2013.  (*Id.* at 28).  On September 3, 2013, the ALJ issued his decision finding Plaintiff ineligible for both DIB and SSI benefits.  (*Id.* at 15-23).  In a letter dated September 17, 2013, Plaintiff requested that the Appeals Council review the ALJ's decision.  (*Id.* at 8).  The Appeals Council denied Plaintiff's request on December 21, 2014, rendering the ALJ's decision the Commissioner's final decision in Plaintiff's case.  (*Id.* at 1-3).

### A.     Plaintiff's Occupational History

In her DIB and SSI application forms, Plaintiff provided her occupational history beginning in 1998.  (SSA Rec. 144, 165).  Plaintiff reported that from 1998 to 1999, she worked as a cook or cashier in a fast-food restaurant.  (*Id.* at 144, 165, 187).  From 1999 to 2001, Plaintiff was a labeler in a household

---

[1]     The facts in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #7), which was filed by the Commissioner.  For convenience, Plaintiff's supporting memorandum (Dkt. #10) is referred to as "Pl. Br.," Defendant's supporting memorandum (Dkt. #12) is referred to as "Def. Br.," Defendant's memorandum in opposition (Dkt. #13) as "Def. Opp.," and Plaintiff's reply memorandum (Dkt. #14) as "Pl. Reply."

[2]     The parties' briefs indicate that Plaintiff's applications were filed on June 25, 2012.  (Pl. Br. 1; Def. Br. 1).  However, a review of the record indicates that Plaintiff filed her applications on June 11, 2012; June 25, 2012 is the date that the applications were received by the SSA.  (SSA Rec. 132).

products factory. (*Id.* at 144, 165). From 2001 or 2002 through 2003, Plaintiff was a home attendant for a home healthcare agency. (*Id.* at 144, 187). From 2003 to 2005 or 2007, Plaintiff was a packer in a leather factory. (*Id.*). And finally, from 2007 through June 28, 2011, the date of alleged onset of Plaintiff's disability, Plaintiff worked as a taxi driver. (*Id.*).

**B.     Plaintiff's Medical History**

**1.     Overview of Plaintiff's Medical History and Primary Care Providers**

Plaintiff's DIB and SSI applications recite that she is disabled on the bases of major depressive disorder, insomnia, panic disorder, onychophagia (nail-biting), high blood pressure, vertigo, anxiety, hyperlipidemia, asthma, gastroesophageal reflux disease, back pain, and bone pain. (SSA Rec. 143). Plaintiff claims to have become disabled on June 28, 2011, at which point she was forced to stop working. (*Id.* at 117, 123, 143).

Plaintiff's relevant medical history began in 2007, when she first visited Harlem Hospital's Bariatric Center of Excellence for nutritional counseling and to explore the possibility of gastric bypass surgery. (*See* SSA Rec. 384-88).[3] Plaintiff received follow-up care at Harlem Hospital for a period of years after this procedure was performed. (*See generally* SSA Rec.). Plaintiff's primary care physician has been Dr. Bienvenido Fajardo, M.D., who has been assisted by Physician's Assistants Altagracia Navarro and Yeimy Hidalgo; they have

---

[3]     Prior to 2007, at some time in 2003, Plaintiff reports undergoing a breast reduction procedure at North General Hospital. (SSA Rec. 288).

treated Plaintiff since September 2011 and have provided care for her iron
deficiency anemia, joint pain, asthma, and vertigo.  (*Id.* at 431-67).  Plaintiff
has been treated for various mental issues by Dr. Fernando Taveras and others
in his office, located in Hudson Heights, beginning in February 2012.  (*Id.* at
673).  Plaintiff's treatment for back pain began in June 2012, when Plaintiff
came under the care of Dr. Mariya Tsinis, a physiatrist located in Staten
Island.  (*Id.* at 327-48).

### 2. Plaintiff's Medical History Prior to Date of Alleged Onset of Disability

#### a. Plaintiff's Respiratory Issues

On September 21, 2007, Plaintiff was admitted to the Emergency Room
at Columbia Presbyterian Hospital, where she presented with complaints of
shortness of breath, chest pain, and anxiety.  (SSA Rec. 269-70).  Noting that
Plaintiff was off of her asthma medication, Singulair, the treating physician
directed Plaintiff to schedule an appointment with her primary care physician,
Dr. Fajardo.  (*Id.* at 270).  She was additionally prescribed the antihypertensive
Benicar and the bronchodilator Albuterol.  (*Id.* at 269-70).  Plaintiff reported
smoking at least one pack of cigarettes each day, and was counseled to stop
doing so.  (*Id.*).[4]  Plaintiff was fully examined and since all laboratory data

---

[4]     Plaintiff made inconsistent statements to her medical care providers, as evidenced by
the records of the Social Security Administration (the "SSA") and Plaintiff's physicians.
Perhaps the best example relates to Plaintiff's tobacco use:  On some occasions, Plaintiff
reported to physicians that she was a long-time and regular tobacco smoker.  (*See, e.g.,*
SSA Rec. 229, 269, 432, 435-36, 673).  At other times, Plaintiff claimed never to have
smoked cigarettes in her life (*see, e.g., id.* at 253, 399, 408, 419, 520-24), or stated that
she was once a smoker but had at some point quit smoking (*see, e.g., id.* at 294).  Other

appeared normal — her stress echocardiogram "showed no wall motion abnormalities even though [it] was submaximal," and her "shortness of breath resolved very rapidly" — Plaintiff was discharged.  (*Id.*).

###### b.   Plaintiff's Bariatric Issues

Plaintiff's first reported major medical procedure was a laparoscopic gastric bypass surgery that she underwent on October 30, 2007.  (SSA Rec. 470, 478-80).  Previously, Plaintiff had been seen by Harlem Hospital's Bariatric Center for various evaluations and pre-operative examinations.  (*See, e.g.*, *id.* at 386-89, 411, 472-78, 547, 552).

The bypass surgery was performed on October 30, 2007, without complication.  (SSA Rec. 470, 478-80).  Before surgery, Plaintiff weighed 214 pounds.  (*Id.* at 227).  After surgery, at its lowest point, Plaintiff's weight was 130 pounds.  (*Id.*).  Plaintiff was seen for post-operative, follow-up appointments routinely in the years following this procedure.  (*See, e.g., id.* at 218, 258, 263, 356, 361, 365, 367, 369, 371, 375, 391, 398, 402, 404, 407-09, 412, 414, 416, 418, 422, 429, 517, 521, 525, 527, 529, 534, 539, 567).  At these visits, Plaintiff often presented without complaint and reported walking daily for exercise.  (*See id.*).  Plaintiff did at times report vomiting, constipation, and fatigue (*see id.*), the last of which was ultimately found to be caused by iron deficiency anemia and treated with iron and other vitamin supplements (*id.* at 254).  Plaintiff's anemia only worsened, however, and she became

---

facts that Plaintiff has inconsistently reported include the positions and dates of her past employment and details about past medical procedures that she has received.

deficient in vitamins C and D, so she was treated with intravenous iron, lactulose, and Ergocalciferol.  (*Id.* at 244, 255).  Plaintiff was also prescribed the antihypertensive Diovan.  (*Id.* at 254).

### c.   Plaintiff's Psychiatric Issues

On two occasions, Plaintiff reported psychiatric issues to Harlem Hospital personnel.  On February 10, 2009, Plaintiff reported to nutritionists there that she was eating because of anxiety, unable to sleep through the night, anxious about her finances, and upset about the death of her father. (SSA Rec. 400).  Plaintiff professed relief at the departure of her abusive boyfriend, but was "visibly upset" by her father's passing.  (*Id.*).  She reported having planned suicide attempts by medication overdoses on three occasions following her father's death, and was ultimately referred to the Psychiatry Department (*id.*),[5] and started on antidepressants (*id.* at 258).[6]  Similarly, on December 1, 2010, Plaintiff reported to a bariatric Physician's Assistant that she had been experiencing suicidal ideation and "nervousness (resulting in frequent falls of her child)."  (*Id.* at 519).  Accordingly, Plaintiff was referred to the psychiatric emergency room, where Dr. Wil Germain diagnosed her with a depressive disorder and discharged her.  (*Id.* at 200, 519).

---

[5]   The record elsewhere indicates that Plaintiff also may have attempted to harm herself in 2006, by "cutting her arm with a knife."  (SSA Rec. 673).

[6]   The exact medications prescribed were not identified; however, elsewhere in the record, Plaintiff is indicated to have been taking the antidepressant Zoloft during this time. (*See* SSA Rec. 254, 673).

### d.      Other Medical Care Received by Plaintiff

Plaintiff received obstetric care at Harlem Hospital throughout 2009. (SSA Rec. 392-93, 531-33).  All testing performed in conjunction with Plaintiff's pregnancy was normal.  (*See id.* at 273, 396-97, 538, 569).  On October 6, 2009, because Plaintiff reported acute abdominal pain and her doctors "[s]uspected bowel herniation," Plaintiff gave birth to her son via Cesarean section.  (*Id.* at 272).

Plaintiff also received treatment on several occasions during this period at Columbia Presbyterian Hospital.  In addition to the aforementioned emergency room visit, Plaintiff was seen on October 11, 2009, for radiographs of her bowel and Computerized Axial Tomography ("CT") scans of her abdomen; on April 26, 2010, for a stomach biopsy and upper gastrointestinal endoscopy; on January 16, 2011, for an exploratory laparoscopy, lysis of adhesions, hernia repair, and CT scans of her abdomen and pelvis; and on February 2, 2011, for a hemoglobin test.  (SSA Rec. 266-87).[7]

### 3.      Plaintiff's Medical History Subsequent to Date of Alleged Onset of Disability

### a.      Plaintiff's Medical Care in Late 2011

On September 27, 2011, Plaintiff received an abdominoplasty (commonly known as a "tummy tuck"), ventral hernia repair, and liposuction at Harlem Hospital.  (SSA Rec. 468, 480-84).  In a follow-up appointment on October 6,

---

[7]      Plaintiff's Columbia Presbyterian records reference only one hernia repair, performed in 2011, but Plaintiff suggests elsewhere in the record that she was hospitalized for hernia operations on prior occasions at Columbia Presbyterian in 2009 and 2010, and also at Harlem Hospital in 2011.  (*See* SSA Rec. 288).

2011, Plaintiff reported that she was "very happy about her physical appearance," and otherwise without complaints. (*Id.* at 248).

On November 17, 2011, Plaintiff reported to Dr. Fajardo with complaints of "dizziness seeing the environment spinning, mainly when getting up," and "left thigh pain." (SSA Rec. 435). She was diagnosed with vertigo and prescribed the motion sickness drug Meclizine. (*Id.* at 436). Plaintiff reported at this time that she was taking the antacid Rantidine twice daily and the antidepressant Bupropion once a day, in addition to Albuterol, Singulair, Diovan, Senna, iron supplements, Miralax, and Ibuprofen. (*Id.* at 435).

### b.   Plaintiff's Medical and Mental Care in 2012

On January 10, 2012, Plaintiff returned to her primary care center, where she was seen by PA Hidalgo for complaints of "very frequent tachycardia on/off at random not related to exertion, associated with nausea[] and dizziness[,] ... bilateral arm and legs parasthesias[,] ... difficulty falling asleep, and feeling very nervous." (SSA Rec. 438). A physical exam was performed and found unremarkable. (*Id.* at 439). Plaintiff was referred to cardiologist Claudia Serrano for her tachycardia and dizziness; to psychiatrist Fernando Taveras for her nervousness, tachycardia, joint pain, insomnia, and general history of depression; and to Modelo Clinica for diagnostic radiology. (*Id.* at 441). Subsequently performed testing — namely "[h]igh-resolution duplex sonography of [Plaintiff's] carotid and vertebral arteries" and a high-resolution ultrasound of Plaintiff's groin — was unremarkable. (*Id.* at 455, 457).

###### c.   A Sharpened Focus on Plaintiff's Psychiatric Care

Plaintiff visited Dr. Taveras for the first time on February 14, 2012.  (SSA Rec. 673).  Plaintiff reported that she had been referred by her primary care doctor because that doctor believed Plaintiff's "body pain [was] due to depression." (*Id.*).  Plaintiff reported having depression since 2006.  (*Id.*).  She had taken medications for it before, first Zoloft and later Wellbutrin, but as of this visit was no longer taking any.  (*Id.*).  Plaintiff "report[ed] poor sleep (2 hrs) with Hydroxyzine," an antihistamine.  (*Id.*).  She additionally reported morning headaches, nightmares, and "increase[d] startled response at night." (*Id.*). Plaintiff described her belief that she could foresee the death of others, an occasional sense that "somebody has done witchcraft on her," and a general dislike of going "outside because somebody might be after her." (*Id.*).  She detailed her history of estrangement from her family and reported having "hypomanic episodes of [three] days duration (buying spree, irritability, decreased need for sleep, [racing] thoughts)" and three "panic attacks (SOB, chest pain, fear of dying, numbness of hand)." (*Id.*).  Plaintiff said that she bit her nails and smoked a pack of cigarettes every day.  (*Id.*).

Dr. Taveras described Plaintiff as "calm, attentive, [and] normal weight," though he noted that Plaintiff appeared unhappy, anxious, and tearful and presented with "borderline psychotic process." (SSA Rec. 674).  In his notes regarding Plaintiff's mental status, Dr. Taveras wrote that Plaintiff's

> [c]ognitive functioning and fund of knowledge [are] intact and age appropriate.  Short and long term memory are intact, as is ability to abstract and do

> arithmetic calculations.   [Plaintiff] is fully oriented.
> Vocabulary and fund of knowledge indicate cognitive
> functioning in the normal range.  Insight into illness is
> fair.  Social judgment is fair.  There are signs of anxiety.
> No signs of withdrawal are in evidence.   No signs of
> intoxication are present.  Her appearance is alert, gait
> is good, and speech is clear.

(*Id.*).  He diagnosed Plaintiff with recurrent major depressive disorder that was severe with psychotic features, cyclothymic (mood) disorder, panic disorder without agoraphobia, and onychophagia.  (*Id.*).  Dr. Taveras instructed Plaintiff to start psychotherapy; begin taking Abilify, Cymbalta, and Ambien; continue taking Neurontin; and stop taking Buspar and Hydroxyzine.  (*Id.*).

Plaintiff returned for a second appointment with Dr. Taveras two weeks later, on March 1, 2012, and Dr. Taveras reported that Plaintiff had already demonstrated improvement.  (SSA Rec. 676).  Dr. Taveras noted that Plaintiff "state[d] she is feeling better, less depressed, no longer crying, sleeping better (8 hrs) … , trying to keep her mind busy, [and] no longer having body pain," though she was still experiencing "increased startled response at night."  (*Id.*).  Plaintiff continued to "think sometimes she feels somebody has done witchcraft on her[,]" but also said "that now she likes to go outside [and] [d]enie[d] panic attacks since last visit."  (*Id.*).

In the weekly and biweekly follow-up appointments that followed throughout 2012 and into 2013, the observations of Plaintiff's physicians were much the same.  Plaintiff consistently reported symptoms of depression (*see, e.g.*, SSA Rec. 678-88), and her doctors generally described these symptoms as improving (*e.g.*, *id.* at 570, 679, 684, 687-90).  Plaintiff reported that she

improved with medication and worsened without it.  (*See, e.g.*, *id.* at 572 ("She states that medications are helping her as she is no longer hearing the voices, … depression has mildly improved."); *id.* at 573 ("She states that medications changed helped sleep better however she continues to feel depressed[.]"); *id.* at 681 ("She states that after she ran out of meds approx[imately] two weeks ago she restarted hearing voices calling her name and poor sleep worsened.")).  Plaintiff was typically reported to be calm, cooperative, friendly, relaxed, and well-groomed; to show no signs of anxiety, hyperactivity, or hallucinations; and to have intact insight and judgment.  (*See, e.g.*, *id.* at 570-74, 679, 683, 687, 690).  Dr. Taveras repeatedly found her to have "no serious mental status abnormalities."  (*Id.* at 570-73).

Several months into 2013, however, Plaintiff began to describe her symptoms as worsening.  On May 14, 2013, Dr. Taveras noted that Plaintiff reported the continuation of her depressive symptoms.  (SSA Rec. 691).  Plaintiff was experiencing "more difficulty concentrating," irritability, sadness, tearfulness, a lack of improvement, and a "subjective feeling of anxiety."  (*Id.*).  Dr. Taveras found her to be displaying a depressed mood, signs of anxiety, and a short attention span.  (*Id.*).  On July 11, 2013, Dr. Taveras noted that Plaintiff's "anxiety symptoms continue.  Multiple medical problems continue[] being reported.  Difficulty concentrating is occurring more frequently.  Feelings of apprehensive expectations have worsened or increased.  Irritability is occurring more frequently.  Sleep problems associated with anxiety continue[] the same."  (*Id.* at 692).  And on August 8, 2013, Dr. Taveras noted Plaintiff's

11

report that "her symptoms are unchanged in frequency or intensity"; that she experienced "increased difficulty concentrating," while her "[i]rritability has increased and worsened"; and that she "continues to feel sad." (*Id.* at 694).

Dr. Taveras completed an impairment questionnaire for Plaintiff's counsel on July 18, 2013; his responses indicated that he had last seen Plaintiff at her July 11, 2013 appointment. (SSA Rec. 579-86). Dr. Taveras diagnosed Plaintiff with impulse control, anxiety, and major depressive disorders that were "not expected to be cured," but that were treatable "with medication along with psychotherapy." (*Id.* at 579). He indicated that Plaintiff was incapable of managing even low stress, and was markedly limited in nearly all mental functions. (*See id.* at 581-85; Pl. Br. 8). Dr. Taveras further noted that Plaintiff "experience[s] episodes of deterioration or decompensation in work or work like settings which cause [her] to withdraw from that situation and/or experience exacerbation of … symptoms" (*id.* at 584), and identified Plaintiff as likely to have both good and bad days (*id.* at 585).

### d.    Plaintiff's Plastic Surgery Consultations in 2012

During the time period that she was receiving treatment from Dr. Taveras and his medical staff, Plaintiff made several visits to the Plastic Surgery Department of Harlem Hospital. In her first visit on February 23, 2012, Plaintiff reported a desire for breast "implant[s] with mastopexy," the latter of which is commonly known as a "breast lift." (SSA Rec. 237, 499). She subsequently received mammograms in conjunction with this request. (*Id.* at 220, 222, 425, 427, 553). On May 8, 2012, Plaintiff again requested breast

implants with mastopexy, and complained of "dog ears from her abdominoplasty surgery." (*Id.* at 495).

On May 31, 2012, her last of these visits, Plaintiff was reportedly "frustrated" by her interactions with physicians in the plastic surgery clinic. (SSA Rec. 493).  The physicians noted,

> Patient is unhappy that we stated to the financial service that her bilateral breast augmentation as well as thigh liposuction is NOT a procedure that is medically necessary....
>
> Patient was made aware that since she had previous breasts surgery, she has only subglandular ptosis and it is therefore not medically necessary to have bilateral breast augmentation with implants.
>
> In addition, patient requested liposuction of bilateral thighs.  Liposuction is not a necessary procedure.  We offered to the patient a thigh lift.  Patient refused.
>
> Patient has dog ears that we offered to remove in excision clinic.  Patient refused and left the clinic room unhappy.

(*Id.*).

### e.    Plaintiff's Medical Care from Dr. Tsinis in 2012 and 2013

Finally, on June 19, 2012, Plaintiff began treatment with physiatrist Dr. Mariya Tsinis, presenting with "neck pain radiating to bilateral arms, numbness in the hands." (SSA Rec. 343).  A series of electrodiagnostic tests were performed, and Plaintiff was diagnosed with "mild bilateral carpal tunnel syndrome (median nerve entrapment at wrist) affecting sensory components." (*Id.* at 345).  Flexeril was prescribed for Plaintiff's bone pain.  (*Id.* at 146).

On June 25, 2012, Magnetic Resonance Imaging scans ("MRIs") of Plaintiff's cervical spine and lumbar spine indicated the presence of "broad disc bulges" at C3/4 and C5/6 that "efface the ventral thecal sac" and, at L4/5, another "broad disc bulge [that] deforms the ventral thecal sac." (SSA Rec. 323-24, 607-08). On August 7, 2012, further electrodiagnostic testing was conducted given Plaintiff's complaints of "lower back pain radiating to bilateral legs [and] bilateral feet numbness." (*Id.* at 337). This testing "reveal[ed] no evidence of lumbar radiculopathy or peripheral neuropathy." (*Id.* at 339).

Dr. Tsinis completed two reports in conjunction with Plaintiff's DIB and SSI claims. In a report to Plaintiff's counsel dated September 25, 2012, Dr. Tsinis noted that Plaintiff suffered from nerve pain, lower back and neck pain, bulging discs, and mild carpal tunnel syndrome, which could be managed with medicine. (SSA Rec. 349-55). She further indicated that "emotional factors ... contribute to severity of [Plaintiff's] symptoms"; that Plaintiff's pain and other symptoms "seldom" interfere with her attention and concentration; and that Plaintiff was likely to have good and bad days. (*Id.*).

In a second report dated August 13, 2013, Dr. Tsinis stated that Plaintiff "experiences daily, aching pain in the cervical and lumbar spine and hands." (SSA Rec. 700). Plaintiff's "primary symptoms" were said to "include low back pain, neck pain, and bilateral hand pain and numbness." (*Id.*). Dr. Tsinis concluded that,

> [i]n an eight-hour workday, [Plaintiff] can only sit for 4 hours and stand or walk for 1 hour, on a sustained basis and she must get up and move around every 30 minutes. [Plaintiff] can lift or carry up to 5 pounds frequently and up to 10 pounds occasionally. She has significant limitations in doing repetitive reaching, handling, fingering, or lifting and minimal limitations with bilateral grasping, twisting, or turning objects; using [her] fingers or hands for fine manipulations; and using her arms for reaching (including overhead). [Plaintiff] experiences pain, fatigue, or other symptoms severe enough to seldom interfere with her attention and concentration.

(*Id.*).

### 4. Consultative Evaluations Undertaken in Conjunction with Plaintiff's DIB and SSI Application

#### a. M. Lucero

After Plaintiff applied for DIB and SSI in June of 2012, she was interviewed by M. Lucero at the SSA's field office. (SSA Rec. 142-57).[8]  Lucero indicated that Plaintiff "seemed very nervous. [S]he was constantly biting her nails. She got up a couple times to stretch and walk around due to back pain. She seemed anxious when the computer system slowed down and she had to wait." (*Id.* at 154).  Lucero further documented that Plaintiff had observable difficulty with concentrating, sitting, and standing, but not with hearing, reading, breathing, understanding, coherency, talking, answering, walking, seeing, using her hand(s), or writing. (*Id.*).

---

[8]  In the administrative record, there are several documents in which an individual's first name is signified only by an initial. For those instances, the Court will list only the initial.

### b.     Dr. Haruyo Fujiwaki

On July 31, 2012, psychologist Haruyo Fujiwaki, Ph.D., performed a
psychiatric evaluation of Plaintiff.  (SSA Rec. 288).  Dr. Fujiwaki found that
Plaintiff had no history of psychiatric hospitalization, while acknowledging that
since January 2012, "she ha[d] been seeing a psychiatrist once per month and
a therapist twice per month at Central Medical Dominicano due to depression."
(*Id.*).  Dr. Fujiwaki identified as Plaintiff's chronic and/or current medical
conditions high blood pressure, "type [two] diabetes, heart disease, asthma,
and a history of seizures as well as vertigo, back pain, and knee pain."  (*Id.*).
For these ailments, Plaintiff was taking a host of medications.  (*Id.*).

Dr. Fujiwaki related that Plaintiff

> has difficulty falling asleep.  Appetite fluctuates.  She
> has experienced depression since 2003.  She does not
> know why she gets depressed.  These days, she feels
> more depressed.  Depressive symptoms include loss of
> energy, social withdrawal, crying spells, irritability, and
> feeling alone.  She becomes anxious in an enclosed
> area.  She is afraid of taking an elevator.  Anxiety is
> experienced with palpitations and sweating.  She denies
> manic symptoms.  She hears voices, most of the time
> telling her to come over.  She denies suicidal ideation,
> plan, or intent.

(SSA Rec. 288-89).  However, Plaintiff's "demeanor and responsiveness to
questions was cooperative," and "[h]er manner of relating, social skills, and
overall presentation was adequate."  (*Id.* at 289).  She was dressed casually and
well-groomed; had normal posture and motor behavior; and made
"appropriately focused" eye contact.  (*Id.*).  Plaintiff had adequate speech and
language skills and her thought processes were "[c]oherent and goal directed

16

with no evidence of hallucinations, delusions, or paranoia." (*Id.*).  Her mood was "dysthymic" (i.e., mildly depressed), her sensorium "clear," and she was "[o]riented to person, place, and time." (*Id.*).  Dr. Fujiwaki characterized Plaintiff's concentration and attention as "intact," noting that she was "able to count and do simple calculations." (*Id.* at 290).  Plaintiff's recent and remote memory skills were, however, "[m]ildly impaired"; her "[i]ntellectual functioning appeared to be slightly below average"; and her "[g]eneral fund of information was somewhat limited." (*Id.*).  Plaintiff's insight and judgment were each characterized as "fair." (*Id.*).

Dr. Fujiwaki summarized Plaintiff's mode of living as follows:

> [Plaintiff] is able to dress, bathe, and groom herself.  At home, she does household chores.  She can manage money.  She can take public transportation alone.  She does not socialize.  Family relationships are reportedly not good, but she has a good relationship with her sister.  Her sister is her friend.  She spends her time watching TV.

(SSA Rec. 290).[9]  Vocationally, Dr. Fujiwaki indicated that Plaintiff could follow simple directions; perform simple tasks and learn new ones with extended time; maintain her attention, concentration, and a regular schedule; and make appropriate decisions.  (*Id.*).  Plaintiff could only perform complex tasks with difficulty and supervision, however.  (*Id.*).  Dr. Fujiwaki postulated that Plaintiff may also "have some difficulty relating with others and dealing with stress

---

[9]     As clarified *infra*, the individual that Plaintiff sometimes identifies as her "sister" is in fact her aunt.  (SSA Rec. 43)

appropriately." (*Id.*).  On the whole, Dr. Fujiwaki concluded that Plaintiff's prognosis was "fair." (*Id.* at 291).

> ### c.    Dr. Vinod Thukral

Also on July 31, 2012, Dr. Vinod Thukral conducted an internal medicine examination of Plaintiff.  (SSA Rec. 292).  He reported that her primary complaint was a "lower backache," from which she had been suffering sharp pain at a level of 10/10 on a scale, and which was "exacerbated by standing (for a long time), bending, and lifting." (*Id.*).  Plaintiff reported relief with "rest and pain medication." (*Id.*).

Dr. Thukral also detailed Plaintiff's reported medical issues, including dull "bilateral knee pain … exacerbated by bending and lifting"; a "history of right wrist pain for the last seven months … dull and intermittent, exacerbated by gripping and lifting"; depression; "intermittent vertigo for the last eight months [that is] … relieved with rest"; a "history of hypertension and hyperlipidemia since 2003"; a "history of diabetes mellitus diagnosed about two months ago"; and "a history of asthma since 1978[,] … triggered by cold weather and dust, [and] relieved with an asthma inhaler." (SSA Rec. 292-93).  Dr. Thukral noted Plaintiff's gastric bypass surgery and subsequent anemia. (*Id.* at 293).  He also indicated that Plaintiff had smoked cigarettes from 1997 through 2011. (*Id.* at 294).

With respect to activities of daily living, Dr. Thukral noted Plaintiff's reports that she does her own "cooking, cleaning, laundry, and shopping as

needed.  She does child care 24/7.  She showers, bathes, and dresses daily.
She watches TV and goes to doctor's appointments."  (SSA Rec. 294).

At the evaluation itself, Plaintiff "appeared to be in no acute distress."
(SSA Rec. 295).  She had a normal gait and could walk on her heels and toes,
squat, change for her exam, get on and off of the exam table, and rise from her
chair without difficulty or use of an assistive device."  (*Id.*).  Plaintiff's physical
features were all described as normal.  (*See id.* at 295-96).

Notably, all of the diagnoses that Dr. Thukral ultimately made were "by
history" alone; none was based on his personal observations.  (SSA Rec. 296).
On the basis of his observations, Dr. Thukral could only find that Plaintiff had
"no limitations for sitting, standing, bending, pulling, pushing, lifting, carrying,
or any other such related activities[, though] [s]he need[ed] to avoid smoke,
dust, or other respiratory irritants due to asthma history."  (*Id.*).

### d.    J. Bartlett

On August 7, 2012, Single Decision Maker J. Bartlett, a non-physician
disability examiner, performed a Residual Functional Capacity ("RFC")
Assessment of Plaintiff.  (SSA Rec. 298-303).[10]  He found that Plaintiff had not

---

[10]    *See* 20 C.F.R. § 404.906(b)(2):

> In the single decisionmaker model, the decisionmaker will make
> the disability determination and may also determine whether the
> other conditions for entitlement to benefits based on disability are
> met. The decisionmaker will make the disability determination
> after any appropriate consultation with a medical or psychological
> consultant. The medical or psychological consultant will not be
> required to sign the disability determination forms we use to have
> the State agency certify the determination of disability to us (see
> § 404.1615).  However, before an initial determination is made that
> a claimant is not disabled in any case where there is evidence

established any exertional limitations.  (*Id.* at 299 (also identifying the medical evidence relied upon for this determination)).  Specifically, Plaintiff was not found to have any postural, manipulative, visual, or communicative limitations.  (*Id.* at 300-01).  Plaintiff's only environmental limitation was a requirement that she avoid concentrated exposure to "[f]umes, odors, dusts, gases, poor ventilation, etc." and "hazards (machinery, heights, etc.)" because of her reported history of asthma and headaches.  (*Id.* at 301).  Bartlett noted that Plaintiff "present[ed] with no physical limitations."  (*Id.* at 302).

### e. Dr. L. Blackwell

On August 8, 2012, state agency medical consultant Dr. L. Blackwell performed a mental RFC assessment for Plaintiff and completed the Psychiatric Review Technique form required under 20 C.F.R. § 404.1520.  (SSA Rec. 304-21).  The form noted the necessity of the assessment, and identified the putative impairments from the listings contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1") as Listing 12.04 (affective disorders) and Listing 12.06 (anxiety-related disorders).  (*Id.* at 304).  Dr. Blackwell also noted that two "medically determinable impairment[s] [were] present that [did] not precisely satisfy the diagnostic criteria" provided on the form, namely, a

---

which indicates the existence of a mental impairment, the decisionmaker will make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment pursuant to our existing procedures (see § 404.1617).  In some instances the decisionmaker may be the disability claim manager described in paragraph (b)(1) of this section.  When the decisionmaker is a State agency employee, a team of individuals that includes a Federal employee will determine whether the other conditions for entitlement to benefits are met.

depressive disorder and an anxiety disorder. (*Id.* at 307, 309). In rating
Plaintiff's degree of functional limitation, Dr. Blackwell found Plaintiff had a
mild restriction of activities of daily living; a mild restriction of difficulties in
maintaining social functioning; a moderate restriction in difficulties
maintaining concentration, persistence, or pace; but no repeated episodes of
deterioration of extended duration. (*Id.* at 314). No evidence was found to
establish the existence of Paragraph C criteria (discussed *infra*). (*Id.* at 315).

In his mental RFC assessment, Dr. Blackwell found that Plaintiff was
"not significantly limited" in any category of memory or understanding; "not
significantly limited" in the ability to carry out simple instructions, maintain
attention or concentration, sustain a routine, work in coordination or proximity
to others, or make simple work-related decisions; "not significantly limited" in
the ability to ask simple questions or ask for help, get along with coworkers, or
maintain socially appropriate behavior or appearance; and "not significantly
limited" in her ability to be aware of hazards and take precautions, travel in
unfamiliar places, use public transportation, set realistic goals, or make
independent plans. (SSA Rec. 318-19). Plaintiff had no marked limitations,
but was "moderately limited" in her ability to carry out detailed instructions;
perform activities within a schedule; maintain regular attendance and
punctuality; interact appropriately with the general public; accept instructions
and respond to criticism; and respond to changes in the work setting. (*Id.*).
Plaintiff was also moderately limited in her "ability to complete a normal
workday and workweek without interruption from psychologically based

21

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.* at 319).

Dr. Blackwell concluded that Plaintiff "reported symptoms of depression and anxiety" and had a "[n]ormal appearance," "coherent and goal directed" thought process, "dysthymic" mood, and "full range" affect. (SSA Rec. 320). Plaintiff was "[o]riented," had intact attention and concentration, and reported an "ability to perform personal care, ... manage money, do[] housework, ... travel independently and socialize[]." (*Id.*). Her memory, however, was "mildly impaired," her "[i]ntellectual functioning appeared to be slightly below average," and her "[i]nsight and judgment" were deemed "fair." (*Id.*).

## C.   Plaintiff's Administrative Hearing

Plaintiff's administrative hearing was held on July 23, 2013, before ALJ Jerome Hornblass. (SSA Rec. 28-51). The hearing was conducted with the assistance of a Spanish interpreter; Plaintiff stated that she understood a little English, but not much, because she had been unable to go to school on account of work obligations. (*Id.* at 30, 33). Plaintiff testified that she had worked steadily for most of her life, but had stopped in 2008 for a reason that she could not remember. (*Id.* at 33). She then worked again until 2011, when she had to stop working because she had "severe back pain" and "severe depression." (*Id.*). When pushed by the ALJ, Plaintiff conceded that, at first, her reason for staying home was to care for her son, but insisted that her main reason for not working was because her sickness and pain left her unable to do

22

so.  (*Id.* at 33-34, 37).  Plaintiff's longest-held job was "factory work," which required that she both sit and stand.  (*Id.* at 35).[11]

Plaintiff explained that she suffered "[s]evere back pain, neck pain, my hands, my wrist, all my joints, and the depression."  (SSA Rec. 35).  She testified that her back pain was in her "[l]ower, middle back" and felt "[l]ike a compression in my back, like tightness, and burning pain, burning sensation." (*Id.*).  When asked how she spent her time since stopping work, Plaintiff responded, "[t]aking care of my child.  Mostly I lie down.  I lie down a lot because I have severe back pain and I can't sit much or stand much because of it."  (*Id.* at 34).  She testified that the pain would come if she sat too much or stood too much, such that she could "hardly do anything because then it gets worse." (*Id.* at 35).  Plaintiff said she could sit 10 to 15 minutes at most before she would need to stand, and that "when I'm mostly comfortable is when I'm lying down, that my back is straight lying down."  (*Id.* at 36).  Plaintiff noted that she takes "Gabapentin 600 milligrams" for this pain.  (*Id.*).  She had been advised to get physical therapy, but claimed that her insurance impeded her ability to do so.  (*Id.* at 46).  Near the end of the hearing, Plaintiff asked for permission to stand, explaining that she was in pain because she had "been sitting too long."  (*Id.* at 48-49).

---

[11]    Plaintiff at first indicated that this job required that she stand for eight hours each day (SSA Rec. 167), but testified in this hearing that she both stood and sat (*id.* at 35).  (*See also* Def. Br. 25).

Plaintiff uses the subway to get around, and testified that the steps both up from and down to the trains are a challenge for her. (SSA Rec. 36). When riding the train, Plaintiff has to alternate between sitting and standing because of her back pain. (*Id.* at 46). Plaintiff cares for her child alone, with the help of her aunt. (*Id.* at 38, 43). Plaintiff said she became estranged from her family in 1998 when her "mother's boyfriend was making advances and [she] told [her] mother" and was thrown out of the house. (*Id.* at 38). Plaintiff lives on the fourth floor, and said that "it takes [her] a long time to get up and down." (*Id.* at 39). Plaintiff claimed to "only go get milk or to my appointments" because she sometimes did not "have the strength to go outside." (*Id.* at 40).

Plaintiff testified that she receives mental health treatment once a month, and sees a therapist every two weeks. (SSA Rec. 40). She testified that she once attempted suicide; she "didn't want to live anymore" and so "tried to overdose on something." (*Id.* at 38). More recently, Plaintiff described hearing voices "[c]all [her] name"; when Plaintiff is alone, she "feel[s] lonely and ... hear[s] them calling [her] name." (*Id.* at 47). Plaintiff described experiencing difficulties focusing and with her memory, explaining that she struggled to remember what she had read just after reading it. (*Id.*). Plaintiff prefers to watch television, and often "put[s] the TV on to keep [her] company." (*Id.* at 48).

Plaintiff described her history of weight management struggles. She said that she had lost over 100 pounds after receiving gastric bypass surgery in 2007, and was happy "[i]n one sense ... because [her] blood pressure doesn't go

24

so high, but aside from that everything is the same." (SSA Rec. 40-41).

Plaintiff emphasized that she hadn't done "the operation for aesthetic

purpose[s], but health purpose[s]." (*Id.* at 41).  She also described the

complications that ensued, noting that she could get an obstruction in her

intestine if she eats or drinks anything, has to receive iron and vitamin B-12

injections for anemia, and has had multiple operations because of stomach

pain.  (*Id.* at 41-42).  Because of these issues, Plaintiff explained that she does

not eat very much and is "always weak and tired." (*Id.* at 42-43).

Finally, Plaintiff discussed the effect that muscle spasms have on her

hands.  (SSA Rec. 45-46).  The spasms, she explained, "can happen at any time

during the day." (*Id.* at 46).  Once they do, she has "to find somebody to twist

[her hands] because they get stiff." (*Id.*).  Plaintiff said that she had difficulty

holding things, and that things "fall from [her] hands." (*Id.* at 48).  For

example, she explained that when she goes to get milk for her child, she has

"trouble holding it to bring it home, so [she] ha[s] to rest in between." (*Id.*).

Additionally, Plaintiff said that her legs swell painfully as the day goes by.  (*Id.*).

## D.    The ALJ's Opinion Denying Benefits

On September 3, 2013, the ALJ issued a decision denying Plaintiff's

applications for DIB and SSI benefits.  (SSA Rec. 15-23).  As a threshold

matter, the ALJ found that Plaintiff had "met the disability insured status

requirements of Title II of the Social Security Act on June 28, 2011, and continue[d] to meet them through December 31, 2015." (*Id.* at 17).

To determine whether Plaintiff was disabled, the ALJ applied the familiar five-step analysis that the Social Security Act, *see* 20 C.F.R. § 416.920, requires. (SSA Rec. 16-22).[12]  Starting at the first step, the ALJ credited Plaintiff's testimony that she had not worked after June 2011 and determined that she had "not engaged in substantial gainful activity since June 28, 2011." (*Id.* at 18).

At step two, the ALJ found that Plaintiff suffered from several impairments that qualified as "severe" under the Social Security Regulations ("SSRs") because they engendered some "work related functional limitations" for Plaintiff. (SSA Rec. 18).  Specifically, the ALJ found Plaintiff's "severe" impairments to include bronchial asthma, bulging discs in her cervical and

---

[12]     The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider [her *per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (per curiam) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

lumbar spines, mild carpal tunnel syndrome, iron deficiency anemia, a depressive disorder, and an anxiety disorder.  (*Id.*).

Moving to step three, the ALJ determined that Plaintiff did not have any impairment or combination of impairments that met or medically equaled the impairments listed in Appendix 1.  (SSA Rec. 18-19).  The ALJ focused here on Plaintiff's mental impairments, evaluating them according to the criteria outlined in Listings 12.04 (affective disorders) and 12.06 (anxiety disorders). (*Id.* at 18).  In order to make this finding, the ALJ had to determine whether Plaintiff had "medically documented persistence" of one or more of the listed symptoms (the "Paragraph A" criteria), which resulted in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration (the "Paragraph B" criteria).  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

If the criteria in Paragraph A and Paragraph B were not sufficiently met, Plaintiff could still be found to be disabled under Listing 12.04 if she had a "medically documented history of a chronic affective disorder of at least [two] years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [i] repeated episodes of decompensation, each of extended duration; or [ii] a residual disease process that has resulted in such marginal adjustment that even a

minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate; or [iii] [a] current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement" (the "Paragraph C" criteria). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Alternatively, Plaintiff could still be found to be disabled under Listing 12.06 if her anxiety disorder "result[ed] in [a] complete inability to function independently outside the area of [her] home." *See id.*

Without identifying whether any of Plaintiff's symptoms would satisfy the Paragraph A criteria of Listings 12.04 (affective disorders) or 12.06 (anxiety disorders), the ALJ determined that Plaintiff's impairments could not be of the requisite severity because they could not satisfy either the Paragraph B or Paragraph C criteria. (SSA Rec. 19). In particular, Plaintiff's impairments did "not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." (*Id.* at 18). Moreover, Plaintiff had only a mild restriction in activities of daily living; mild difficulties with social functioning; and no more than moderate difficulties with concentration, persistence, or pace. (*Id.* at 18-19). She had "no complete inability to function outside of her home" or outside of a "highly supportive living arrangement," nor had she experienced any episodes of decompensation of extended duration. (*Id.* at 19).

The ALJ's analysis at step 4 proceeded in two parts: The ALJ first determined Plaintiff's residual functional capacity ("RFC"). Second, he

evaluated whether Plaintiff's RFC precluded the performance of activities that would be required by Plaintiff's past relevant work.  With regard to the first of these parts, the ALJ noted at the outset that he would evaluate all of Plaintiff's symptoms, "and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including opinion evidence, all in accordance with the relevant regulations. (SSA Rec. 19).  The ALJ proceeded to find that Plaintiff's exertional limitations permitted her to "sit, stand[,] or walk for up to six hours, with normal breaks, in an eight hour workday, and []lift/carry/push pull objects weighing up to 20 pounds frequently or 10 points occasionally[.]" (*Id.*).  Plaintiff was accordingly "limited to light work." (*Id.*).  Additionally, the ALJ identified non-exertional limitations that limited Plaintiff "to unskilled work involving the performance of no more than two or three-step tasks" and prevented her from working "in environments with very high levels of respiratory irritants such as fumes, noxious chemicals[,] and dust[.]" (*Id.*).

In finding these limitations, the ALJ reviewed the various medical consultations and treatments in the record.  (SSA Rec. 19-23).  He began with the records for October 2007, when Plaintiff underwent gastric bypass surgery. (*Id.* at 19).  The ALJ found "no indication in the record" that Plaintiff's surgery or related procedures "caused [Plaintiff] any significant medical problems." (*Id.*).  Plaintiff's surgery was performed at Harlem Hospital, and so the ALJ reviewed the follow-up care that she received there after the procedure, from September 2011 to June 2012, noting that on no occasion was Plaintiff

"physically impaired to any significant degree." (*Id.* at 20).  According to those records, Plaintiff denied having complaints and rather reported, on June 25, 2012, for example, that she exercised three times each week by dancing and generally walked 20 blocks each day.  (*Id.*).

The ALJ next reviewed the evaluations of Plaintiff's principal medical care providers, Dr. Fajardo and the PAs with whom he worked.  (SSA Rec. 19-20).  The ALJ contrasted Plaintiff's alleged symptoms with the consistently unremarkable results of medical examinations performed on her.  (*Id.* at 20).

The ALJ proceeded to evaluate Plaintiff's treatment by Dr. Tsinis, which began in June of 2012.  (SSA Rec. 20).  The ALJ noted that Plaintiff visited Dr. Tsinis for "low back pain, a complaint never voiced to doctors previously."  (*Id.*).  He described the testing performed, citing the MRIs that found disc bulges, the electrodiagnostic study that evinced mild bilateral carpal tunnel syndrome, as well as the studies that found no problems at all.  (*Id.*).  The ALJ also reviewed Dr. Tsinis's treatment notes, which described Plaintiff's physical exams through June 2013 as "remarkable only for reduced range of motion of the spine, mild spinal muscle spasm, and tenderness of the spine."  (*Id.*).  Dr. Tsinis described Plaintiff's normal gait, lack of neurological deficits, and improvement in pain upon medication, though she also noted Plaintiff could not sit more than four hours in an eight hour workday, stand/walk for one hour in an eight hour workday, or lift greater than 10 pounds.  (*Id.* at 20-21).

Next, the ALJ reviewed evidence relating to Plaintiff's mental health treatment.  (SSA Rec. 21).  The ALJ noted that Dr. Taveras's medical source

statement on July 11, 2013,[13] had identified "diagnoses of Impulse Control
Disorder and Anxiety Disorder"; described Plaintiff's "many psychiatric-based
symptoms, such as mood disturbance, anhedonia, difficulty concentrat[ing],
generalized anxiety, and perceptual disturbances"; and concluded that Plaintiff
had "'marked' limitations in most areas of functioning" that would prevent her
from performing "even 'low stress' work." (*Id.*).  The ALJ also found, however,
that Dr. Taveras's July 2013 statement was "in direct contradiction with
treatment notes from July 2012 through November 2012, all of which state[d]
that [Plaintiff had] 'no serious mental status abnormalities,'" and some of
which noted that Plaintiff was improved and stable.  (*Id.*).

Having thus chronicled the care Plaintiff received from her treating
physicians, the ALJ went on to consider the consultative medical examinations
performed in conjunction with Plaintiff's applications for DIB and SSI.  He
noted that although Plaintiff had "complained of low back pain for seven
months, knee pain for seven months, right wrist pain for seven months,
depression since 2003, intermittent vertigo (occurring once a month) for eight
months, asthma since 1978, a recent diagnosis of diabetes, and anemia treated
with an iron supplement," Dr. Thukral's consultative physical examination
"revealed no abnormal findings."  (SSA Rec. 20).  Rather, Dr. Thukral reported
Plaintiff's statements that she cooked, cleaned, shopped, laundered clothes,

---

[13]   The ALJ wrote that "Dr. Taveras … completed a medical source statement on July 11,
2013."  (SSA Rec. 21).  However, the record indicates, and the parties agree, that Dr.
Taveras's statement was completed on July 18, 2013.  (*See id.* at 579-86; *see also* Pl.
Br. 7; Def. Br. 15).

and cared for her two-year-old son without assistance.  (*Id.*).  Dr. Thukral "concluded that the claimant had no significant exertional limitations, [though] she should avoid smoke, dust, and other respiratory irritants due to her asthma history."  (*Id.*).

Similarly, the ALJ continued, Plaintiff's consultative psychiatric examination performed by Dr. Fujiwaki was "unremarkable," though Plaintiff presented with complaints of depression and anxiety.  (SSA Rec. 21).  The ALJ cited various of Dr. Fujiwaki's findings: Plaintiff's demeanor and responsiveness were cooperative; her manner of relating, social skills, and overall presentation were "adequate"; she was "dressed casually and well groomed"; her "[p]osture and motor behavior were normal"; she had coherent thought processes and no hallucinations, delusions, or paranoia; her "[a]ffect was of full range and appropriate in speech and thought content; "[s]he had a dysthymic mood"; and "her attention and concentration were intact."  (*Id.*). However Plaintiff's memory was found to be "mildly impaired"; her intellectual functioning slightly below average; her "[g]eneral fund of information … somewhat limited"; and her "[i]nsight and judgment were fair."  (*Id.*).  Plaintiff reported to Dr. Fujiwaki that she could "dress, bathe, and groom herself," perform household chores, manage her finances, and take public transportation alone, but also that she did not socialize, had poor family relationships (but for a positive relationship with her "sister," whom Plaintiff indicated was actually her aunt, *see id.* at 43), and spent her free time watching television (*id.* at 21).  The ALJ also relayed Dr. Fujiwaki's vocational

32

conclusion that Plaintiff could "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, and … learn new tasks with extended time," though "she would need supervision with complex tasks" and could "have some difficulty relating with others and dealing with stress appropriately." (*Id.*).

The final medical source statement reviewed was that provided by medical consultant psychologist Dr. Blackwell on August 8, 2012. (SSA Rec. 21). This statement indicated Plaintiff had "no more than moderate limitations in any area of mental functioning, and no significant limitation in most areas of mental functioning." (*Id.*).

Having considered all of these opinions, the ALJ concluded at this stage of his analysis that, with regard to her physical capacity, Plaintiff could perform "light work, reduced only by the need to avoid environments with **very high** levels of respiratory irritants." (SSA Rec. 21).[14] He found that Plaintiff's "only physical condition … caus[ing] any limitations is her spinal disorder." (*Id.* at 21-22). He explained that there were no indications that Plaintiff's carpal tunnel syndrome caused serious pain or dysfunction, nor that Plaintiff had neurological abnormalities or an impeded gait. (*Id.* at 22).

The ALJ accorded little weight to Dr. Tsinis's conclusions in this analysis, because she "reported minimal findings." (SSA Rec. 22).

---

[14]    The ALJ placed extra stress on the "very high" feature of this conclusion. (SSA Rec. 21).

33

Furthermore, the ALJ noted, Plaintiff's "own statements regarding her activities," in her statements to the consultative doctors and elsewhere "clearly show[ed]" that she could "do much more than reported by Dr. Tsinis." (*Id.* at 22). Indeed, the ALJ found that Plaintiff's "statements regarding the severity of her symptoms and the degree of her functional limitations [were] not 'in line' with [Plaintiff's] own reports of her activities or the objective medical evidence." (*Id.*).

With regard to Plaintiff's mental abilities, the ALJ found that Plaintiff's psychiatric conditions were "clearly more mild than [she] maintain[ed]." (SSA Rec. 22). The ALJ cited the facts provided by Plaintiff as recorded in her July 21, 2012 report. (*Id.*). Again, the ALJ gave little weight to the treating physician — here, Dr. Taveras — "in light of his own reports in treatment notes that her mental status exams showed no serious abnormalities." (*Id.*). He gave "greater weight" to Dr. Fujiwaki's conclusions, which the ALJ found to be "more consistent with the near-normal mental status exams and the claimant's abilities as shown by her daily activities." (*Id.*). Even granting that Plaintiff's "mood disorder and anxiety disorder may [have caused] an inability to perform complex work tasks," the ALJ found that Plaintiff was "clearly capable of performing unskilled work involving no more than two or three step tasks." (*Id.*). Finally, the ALJ noted the lack of evidence of "significant socialization problems, intellectual deficits, or serious concentration limitations that would significantly interfere with her ability to perform in the workplace." (*Id.*).

34

Turning to the second stage of step four, the ALJ concluded that
Plaintiff's various medical impairments did not impede her ability to perform
past relevant work.  (SSA Rec. 22).  Identifying as past relevant work Plaintiff's
employment as a factory packer and stamper, the ALJ noted that performing
either job would be within the limits of Plaintiff's RFC.  (*Id.*).

Thus, the ALJ concluded, Plaintiff was not "under a disability, as defined
in the Social Security Act," and any point during the time period from July 28,
2011, to September 3, 2013, the date of his decision.  (SSA Rec. 22-23).
Accordingly, the ALJ denied Plaintiff's applications for DIB and SSI.  (*Id.* at 23).

## E.   Plaintiff's Appeal and the Instant Litigation

Plaintiff was provided with written notice of the ALJ's decision, and
timely requested that the Appeals Council reconsider it.  (*See* SSA Rec. 8-11).
On December 21, 2014, the Appeals Council denied Plaintiff's request.  (*Id.* at
1, 195).  The instant appeal followed.

## DISCUSSION

## A.   Applicable Law

### 1.   Motions under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings
are closed — but early enough not to delay trial — a party may move for
judgment on the pleadings."  Fed R. Civ. P. 12(c); *see generally Greek* v. *Colvin*,
802 F.3d 370, 374 (2d Cir. 2015) (per curiam) (evaluating a district court's
grant of motion for judgment on the pleadings in the context of an SSA appeal).
A court applies the same standard applied to a motion for judgment on the

pleadings as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering either, a court should "draw all reasonable inferences in Plaintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'"  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to have 'nudged [Plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).

### 2.    Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate her "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also id.* § 423(a)(1)(A); 20 C.F.R. § 416.202 (outlining SSI qualifications); 20 C.F.R. § 416.905 (using DIB definition of "disability" to define "disability" for

SSI purposes); *accord, e.g.*, *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Furthermore, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard. *Selian* v. *Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (internal quotation marks omitted) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012))). Where the findings of the SSA are supported by substantial evidence, those findings are "conclusive." *See, e.g.*, *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) (citing 42 U.S.C. § 405(g)).

"'Substantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the 'clearly erroneous' standard."  *Brault* v. *Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  To make the determination of whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (internal quotation marks omitted) (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

Finally, the presiding ALJ has an affirmative obligation to develop the administrative record.  *See, e.g.*, *Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); *Perez* v. *Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *see generally Sims* v. *Apfel*, 530 U.S. 103, 111 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, and exists even when ... the claimant is represented by counsel." *Pratts* v. *Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal citations omitted).  Moreover, the obligation "is 'enhanced when the disability in question is a psychiatric impairment.'"  *Piscope* v. *Colvin*, No. 15 Civ. 8745 (GWG), 2016 WL 4429891, at

*5 (S.D.N.Y. Aug. 23, 2016) (quoting *Lacava* v. *Astrue*, 2012 WL 6621731, at

*11 (S.D.N.Y. Nov. 27, 2012) (citing 20 C.F.R. Part 404, Subpt. P, App. 1

§ 12.00(E))); *see also Gabrielsen* v. *Colvin*, No. 12 Civ. 5694 (KMK) (PED), 2015

WL 4597548, at *4 (S.D.N.Y. July 30, 2015) (collecting cases recognizing the

same).   In all cases, the ALJ must "make every reasonable effort to obtain from

the individual's treating physician (or other treating health care provider) all

medical evidence, including diagnostic tests, necessary in order to properly

make" a determination as to the claimant's disability.   42 U.S.C. § 423(d)(5)(B).

**B.   Analysis**

> **1.   Overview of the Parties' Arguments**

Plaintiff principally argues that the ALJ failed to weigh the medical

evidence in this case properly.   (Pl. Br. 14; Pl. Reply 1-2).   She claims that the

ALJ accorded the opinions of treating physicians Dr. Tsinis and Dr. Taveras

"little weight," but failed to explicate those decisions as required by federal law.

(Pl. Br. 14-16; Pl. Reply 2).   Furthermore, she contends that the ALJ failed to

weigh the opinions of these physicians according to the factors provided in 20

C.F.R. §§ 404.1527 and 416.927.   (Pl. Br. 16-19).

Plaintiff further argues that the ALJ failed to make a proper credibility

finding with regard to her testimony.   (Pl. Br. 19; Pl. Reply 2-3).   Because the

ALJ evaluated Plaintiff's statements according to the regulations governing

credibility findings, Plaintiff contends, the ALJ was required to indicate

whether he found her credible and, if he did not, to provide specific reasons for that conclusion.  (Pl. Br. 19-21; Pl. Reply 2-3).[15]

In response, Defendant argues that the ALJ both appropriately weighed the opinions of the treating and consultative physicians and described his reasons for doing so explicitly and with the requisite degree of detail.  (Def. Br. 18-23; Def. Opp. 1-7).  Defendant also contends that the ALJ properly evaluated Plaintiff's credibility, finding her not credible and identifying the evidence that supported his conclusion.  (Def. Br. 23-24; Def. Opp. 7-9). Finally, Defendant argues that the ALJ properly found that Plaintiff could perform past relevant work.  (Def. Br. 24-25).[16]

### 2.    The ALJ Erred in His Application of the Treating Physician Rule

#### a.    Applicable Law

The treating physician rule establishes that the opinion of a claimant's treating physician is entitled to "controlling weight" as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

---

[15]    In Plaintiff's March 28, 2014 letter to the Appeals Council, Plaintiff argued that the ALJ's decision should be vacated for two additional reasons: (i) the ALJ "failed to obtain a vocational expert in order to determine how [Plaintiff's] non-exertional limitations eroded the occupational base"; and (ii) the ALJ found Plaintiff's carpal tunnel issues to be severe at step two, but then failed to account for that impairment when assessing Plaintiff's RFC.  (SSA Rec. 195-97).  These arguments have not been pursued before this Court, and thus are not discussed here.  *See Jackson* v. *Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").

[16]    This Court need not reach this last argument, however, because Plaintiff does not dispute it.  Instead, Plaintiff disputes the validity and analysis of the evidence on which the ALJ relied in making his disability finding.

record," *Burgess* v. *Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (internal quotation marks omitted) (quoting 20 C.F.R. § 404.1527(c)(2)), including "opinions of other medical experts," *Petrie* v. *Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) (quoting *Halloran* v. *Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)).  Treating physicians are afforded this significant deference because they are believed to be best positioned to provide both "a detailed, longitudinal picture" of a claimant's medical situation and other evidence that may be difficult to capture in "objective medical findings alone or ... reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  Accordingly, before an ALJ may "reject a treating physician's diagnosis" as inconsistent with the administrative record, the ALJ must first endeavor to "fill any clear gaps" in that record.  *Rosa* v. *Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

If an ALJ still elects to give a treating physician's opinion less than "controlling weight," that ALJ must consider a variety of factors to determine what weight the opinion is owed.  *Petrie*, 412 F. App'x at 406 (citing 20 C.F.R. § 404.1527(d)(2)).  Specifically, the ALJ must evaluate: "(i) the frequency of examination and the length, nature[,] and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion."

41

*Petrie*, 412 F. App'x at 406; *accord Halloran*, 362 F.3d at 32.  An ALJ need not walk through each relevant factor "mechanically," *McGann* v. *Colvin*, No. 14 Civ. 1585 (KPF), 2015 WL 5098107, at *12 (S.D.N.Y. Aug. 31, 2015), but is nonetheless obligated to provide "good reasons" for his deference determination, *see* 20 C.F.R. § 404.1527(c)(2).  *Accord Atwater* v. *Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *Halloran*, 362 F.3d at 32-33.

### b.    The ALJ Appropriately Applied the Treating Physician Rule with Regard to Dr. Tsinis

Plaintiff alleges that, contrary to the ALJ's findings, Dr. Tsinis's opinion was "supported by appropriate clinical and diagnostic testing." (Pl. Br. 15). Plaintiff emphasizes that Dr. Tsinis specifically based her opinion on her clinical examinations of Plaintiff's physical condition and a variety of medical testing, including "diagnostic cervical MRIs and an EMG/NCV of the upper extremities"; "an EMG/NCV that documented carpal tunnel syndrome[;] and MRIs that showed broad disc bulges at C3-C4 and C5-C6 that effaced the ventral thecal sac and a broad disc bulge at L4-L5 causing deformity in the ventral thecal sac." (*Id.* (internal citations omitted)).  Furthermore, Plaintiff argues, the ALJ failed to identify evidence in the record that actually contradicted Dr. Tsinis's opinion.  (*Id.*).  Rather, the ALJ overemphasized the evidentiary value of Plaintiff's performance of "activities of daily living"; these activities, Plaintiff claims, were "hardly significant activities comparable to the demands of full-time competitive employment and do not contradict the limitations described by Dr. Tsinis." (*Id.* at 15-16).  Arguing in the alternative,

Plaintiff contends that if Dr. Tsinis's opinion were not owed "controlling weight," the ALJ failed to consider it according to all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  (*Id.* at 16).  This failure "was not harmless as [these factors] weighed in favor of deference to [Dr. Tsinis]."  (*Id.*).

The Court does not agree.  First, the ALJ did not err in finding that the opinion of treating physician Dr. Tsinis merited "little weight," because Dr. Tsinis "reported minimal findings" and because her opinion was not consistent with other evidence in the record, including her own treatment notes, Dr. Thukral's physical examination report, various unremarkable electrodiagnostic studies, and Plaintiff's "own statements regarding her activities."  (SSA Rec. 21-22).  These inconsistencies were a valid justification for the ALJ's decision not to give Dr. Tsinis's opinion controlling weight.

Furthermore, upon finding that Dr. Tsinis's opinion was not controlling, the ALJ properly considered the requisite factors to determine what weight to give it.  The ALJ considered the length and nature of the treatment relationship, noting that Plaintiff "came under the care of Dr. M. Tsinis in June 2012."  (SSA Rec. 20).  The ALJ considered the evidence underlying Dr. Tsinis's opinion, namely, that Plaintiff presented to Dr. Tsinis with complaints of low back pain and that MRIs indicated multiple disc bulges.  (*Id.*).  However, the ALJ also noted that Dr. Tsinis's ultimate determination was inconsistent with the record as a whole; it was contradicted by Dr. Tsinis's documented observations of Plaintiff's symptoms and physical capacity, by physical exams and unremarkable electrodiagnostic studies, by notes regarding the efficacy of

43

medication in minimizing Plaintiff's pain without significant side effects, and by Plaintiff's own statements regarding her capacity.  (*Id.* at 20-22).

### c.  Any Error in the ALJ's Assessment of the Opinion of Dr. Thukral Was Harmless

In a footnote, Plaintiff alleges that the ALJ failed to "indicate what weight, if any, was given to the opinions from the physical consultative examiner" Dr. Thukral.  (Pl. Br. 14 n.48).  The ALJ clearly utilized this opinion, noting that, in contrast to the opinion of Dr. Tsinis and Plaintiff's testimony, Dr. Thukral's examination "revealed no abnormal findings," leading Dr. Thukral to conclude that Plaintiff "had no significant exertional limitations."  (SSA Rec. 20).  The ALJ further considered the statements that Plaintiff made to Dr. Thukral at the examination regarding her capacity to perform household chores and care for her child.  (*Id.*).  However, the ALJ's failure to assign a specific weight to Dr. Thukral's opinion was at most harmless error.  Dr. Thukral's opinion was clearly not dispositive; it was only one piece of evidence among several on which the ALJ relied to reach his conclusions that Dr. Tsinis and Plaintiff's characterizations of Plaintiff's physical condition were not credible.  *Cf. Zabala* v. *Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (explaining that ALJ's failure to consider even a treating physician's report could be harmless error if there was "no reasonable likelihood" that considering it would have changed the disability determination").

44

### d.   The ALJ Inappropriately Applied the Treating Physician Rule with Regard to Dr. Taveras

The ALJ was not, however, justified in giving "little weight" to the opinion of treating physician Dr. Taveras, and "greater weight" to the opinion of consultative psychologist Dr. Fujiwaki.  (*See* SSA Rec. 22).  In this regard, Plaintiff first disputes the ALJ's characterization of Dr. Taveras's mental status exams, which she claims consistently detailed a variety of physical symptoms and "'serious' psychiatric abnormalities."  (Pl. Br. 17).  But even if Dr. Taveras's opinion were not controlling, the ALJ was obligated to weigh it according to the § 404.1527 regulatory factors and failed to do so.  (*Id.* at 18-19).  Plaintiff further argues that the ALJ erroneously relied on the opinion of Dr. Fujiwaki as substantial evidence; Dr. Fujiwaki only observed Plaintiff on one occasion, had not been provided with Plaintiff's treatment records, and was not a psychiatrist like Dr. Taveras.  (*Id.* at 17-18).

Here, this Court agrees with Plaintiff that the ALJ's evaluation of the treating physician was improper.  The ALJ's analysis failed at the first step, where he found that the treating physician opinion of Dr. Taveras was not entitled to controlling weight because his conclusions were in conflict with "his own reports in treatment notes that [Plaintiff's] mental status exams showed no serious abnormalities," and Plaintiff's "abilities as shown by her daily activities."  (SSA Rec. 22).  The conflict identified and described by the ALJ focused on the difference between Dr. Taveras's "treatment notes from July 2012 through November 2012" — which the ALJ emphasized consistently "state[d] that the clamant has 'no serious mental status abnormalities'" (*id.* at

45

21) — and Dr. Taveras's final July 18, 2013 opinion that Plaintiff's mental illness was wholly disabling (*id.* at 21-22).

Significantly, however, a consideration of Dr. Taveras's treatment notes after November 2012 calls the existence of the cited "conflict" into question. The doctor's notes from May 14, July 11, and August 8, 2013, for example, describe a significant worsening of Plaintiff's symptoms of depression and anxiety.  (SSA Rec. 691-94).[17]  In these visits, Dr. Taveras observed the existence of new symptoms there were not demonstrated previously — namely, difficulties with focus and concentration — which are highly relevant to Plaintiff's RFC.  (*Id.*).

These treatment notes were not in conflict with Dr. Taveras's opinion as articulated in his treatment questionnaire for Plaintiff's counsel.  Notably, the latter acknowledged that Plaintiff experienced episodes of deterioration or decompensation.  (SSA Rec. 584).  There is also no conflict between these notes and the opinion of Dr. Fujiwaki, whose opinion reported Plaintiff's statement that "[t]hese days, she feels more depressed," experiencing symptoms like "loss of energy, social withdrawal, crying spells, irritability, and feeling alone."  (*Id.* at 288-89).  Worsening depression and anxiety may also explain the discrepancy between Plaintiff's self-reported symptoms and symptoms confirmed by objective medical testing; if, as Plaintiff's primary care physician has speculated in the past (*id.* at 673), Plaintiff's physical symptoms are

---

[17]     The Court recognizes that the August 2013 notes postdate Dr. Taveras's opinion, but considers them because they accord with the May and July 2013 notes.

manifestations of her mental illness, the worsening of the former could conceivably evidence the worsening of the latter. Dr. Tsinis, for example, noted that "emotional factors contribute to severity of [Plaintiff's] symptoms." (*Id.* at 352-54).

The Court finds that remand is required to determine the reasons for the discrepancy between Dr. Taveras's treatment notes from 2012 and his treatment notes and opinion from 2013. The ALJ knew or should have known that Plaintiff was receiving psychiatric treatment between November 2012 and July 2013, and that he was missing the treatment notes for this time period; Plaintiff's testimony at her administrative hearing and Dr. Fujiwaki's report indicate that Plaintiff receives monthly psychiatric treatment and bimonthly therapy, and Dr. Taveras's report indicated that he had last seen Plaintiff for treatment on July 11, 2013. (SSA Rec. 40, 288, 579). Because the ALJ has an affirmative duty to develop the record, which may be heightened when the disability at issue is a psychiatric disorder, he could not "reject [Dr. Taveras's] diagnosis without first attempting to fill [this] clear gap[] in the administrative record." *See Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *see also* 20 C.F.R. § 404.1512(d)-(e); *id.* § 416.912(d)-(e); *Curto* v. *Astrue*, No. 07 Civ. 3711 (DLC), 2008 WL 564628, at *2 (S.D.N.Y. Mar. 3, 2008) ("In cases 'in which the primary problem with the decision below is that the ALJ failed adequately to develop the record before her,' remand is appropriate." (internal citation omitted) (quoting *Rosa*, 168 F.3d at 83 n.8)).

Whether Plaintiff had marked limitations caused by her psychiatric disorders was a question that had to be resolved to determine whether Plaintiff was disabled.  *See Rolon*, 994 F. Supp. 2d at 505.  The ALJ thus should have acted affirmatively to determine the genesis of the perceived inconsistencies between Dr. Taveras's notes and opinions.  *See Clark* v. *Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also, e.g., Rolon* v. *Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 504 (S.D.N.Y. 2014) (internal quotation mark omitted). "If asked, [Dr. Taveras] might have been able to provide a medical explanation for why [Plaintiff's] condition deteriorated over time." *Clark*, 143 F.3d at 118; *see also Rosa*, 168 F.3d at 80.  Rather than recontacting Dr. Taveras as he should have, however, the ALJ resolved the conflict by giving Dr. Taveras's opinion "little weight."  *See Rolon*, 994 F. Supp. 2d at 505 (citing 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1)).  This was error, and the Court must remand.  *See Rosa*, 168 F.3d at 80 (finding that by foregoing opportunities to resolve inconsistencies, "and by rejecting a treating physician's medical assessment without fully developing the factual record, the ALJ committed legal error").  On remand, the ALJ must obtain additional information from Dr. Taveras in order to clarify the purported inconsistency between his treatment notes and final opinion; the ALJ may arrive at the same decision, but he must do so by following the proper procedure.

### 3.     The ALJ Properly Evaluated Plaintiff's Credibility

#### a.     Applicable Law

An ALJ is "required to take the claimant's reports of pain and other limitations into account" when assessing a claimant's RFC, *Genier* v. *Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citing 20 C.F.R. § 416.929), though statements about "pain or other symptoms will not *alone* establish" a disability, 20 C.F.R. § 404.1529(a) (emphasis added).  An ALJ has discretion to reject a claimant's subjective complaints, *e.g.*, *Cohen* v. *Comm'r of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016) (summary order), but he can only do so pursuant to the two-step process required by the relevant regulations, 20 C.F.R. § 404.1529(a).  "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record."  *Id.* (alteration in original) (quoting 20 C.F.R. § 404.1529(a)).

If a claimant's alleged symptoms "are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry."  *Meadors* v. *Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order).  This credibility inquiry

> implicates seven factors to be considered, including:
> [i] the claimant's daily activities; [ii] the location,
> duration, frequency, and intensity of the pain;
> [iii] precipitating and aggravating factors; [iv] the type,
> dosage, effectiveness, and side effects of any
> medications taken to alleviate the pain; [v] any
> treatment, other than medication, that the claimant has
> received; [vi] any other measures that the claimant
> employs to relieve the pain; and [vii] other factors
> concerning the claimant's functional limitations and
> restrictions as a result of the pain.

*Id.* at 184 n.1 (citing 20 C.F.R. § 404.1529(c)(3)).  The ALJ's ultimate credibility

determination "must contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be sufficiently specific

to make clear to the individual and to any subsequent reviewers the weight the

[ALJ] gave to the individual's statements and the reasons for that weight."

*Cichocki* v. *Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order) (quoting

SSR 96-7p, 1996 WL 374186, at *2); *see also Williams ex rel. Williams* v.

*Bowen*, 859 F.2d 255, 260-261 (2d Cir. 1988) (citing *Carroll* v. *Sec'y of Health*

*and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)).  However, though the

ALJ must do more than "make a single, conclusory statement that the claimant

is not credible or simply to recite the relevant factors," *Cichocki*, 534 F. App'x at

76 (quoting SSR 96-7p, 1996 WL 374186, at *2) (internal quotation mark

omitted), "remand is not required where 'the evidence of record permits us to

glean the rationale of an ALJ's decision,'" *id.* (quoting *Mongeur*, 722 F.2d at

1040).  Furthermore, "[w]here supported by specific reasons, 'an ALJ's

credibility determination is generally entitled to deference on appeal.'"  *Evans* v.

*Colvin*, — F. App'x —, No. 15-2569-cv, 2016 WL 2909358, at *3 (2d Cir.

May 19, 2016) (summary order) (quoting *Selian*, 708 F.3d at 420).

### b.    Discussion

Plaintiff contends that in this case, the ALJ "evaluated [her] statements

under the Regulations related to making credibility determinations, but failed

to indicate if he found Plaintiff credible or not, and did not give any specific

reasons" for his finding.  (Pl. Br. 20 (citation omitted)).  "There is no evidence,"

Plaintiff asserts, that "the ALJ considered a single applicable factor here."  (*Id.*

at 20-21).

The Court cannot agree.  The ALJ assessed Plaintiff's credibility

according to the requisite two-step process.  At the first step, the ALJ

determined that Plaintiff had mental illnesses, asthma, carpal tunnel issues,

and a spinal disorder — medically determinable impairments all — that could

reasonably produce pain and impair Plaintiff's functioning.  (SSA Rec. 21-22).

At the second step, the ALJ evaluated the intensity of Plaintiff's symptoms in

light of all the available evidence: With regard to Plaintiff's functional

limitations, the ALJ found that Plaintiff's "own statements regarding her

activities[,] … the severity of her symptoms[,] and the degree of her functional

limitations [were] not 'in line' with her own reports of her activities or the

objective medical evidence."  (*Id.* at 22).  The ALJ also determined that

Plaintiff's psychiatric conditions were "clearly more mild than [she]

maintain[ed]."  (*Id.* (citing a July 2012 report completed by Plaintiff)).

Accordingly, the ALJ was obligated to "engage in a credibility inquiry." *Meadors*, 370 F. App'x at 183. He properly did so by evaluating the factors outlined in 20 C.F.R. § 416.929(c)(2). The ALJ considered Plaintiff's daily activities, noting that Plaintiff reported in "statements to the consultative doctors" and in a report completed on July 21, 2012, that she had "no significant problems with household chores and caring for her young son." (SSA Rec. 22). Plaintiff "stated that she uses public transportation independently[;] handles her own finances[;] ... takes care of her toddler son[;] ... [and has no] problem getting along with others, following instructions[,] or finishing activities that she starts." (*Id.*). The ALJ considered the location, duration, frequency, and intensity of Plaintiff's physical and mental symptoms. He found that her back pain, for example, was localized in her lower back, reported in June 2012 for the first time, and alleged to have lasted seven months. (*Id.* at 20). Plaintiff's "psychiatric-based symptoms" were also chronicled, noted to have lasted since at least April 2011, and recognized as of sufficient magnitude as to "cause an inability to perform complex work tasks." (*Id.* at 21-22). The ALJ found that Plaintiff's back pain was relieved by medication "without significant side effects," and that regular therapeutic appointments with Dr. Taveras had stabilized Plaintiff, improved her depression, and given her "better energy." (*Id.* at 20-21). Plaintiff's anemia was treated by iron supplements and her asthma "controlled" by medication. (*Id.*). The ALJ noted that Plaintiff reported managing her "physical complaints" by

52

dancing for exercise for one hour, three times per week, and by walking 20 blocks daily.  (*Id.* at 20).

The only factor that the ALJ failed to consider explicitly was the third listed in the regulations, the "[p]recipitating or aggravating factors" of Plaintiff's pain or symptoms.  *See* 20 C.F.R. § 404.1529(c)(3).  However, the ALJ provided "specific reasons for his credibility determination," and "the record evidence permits [the Court] to glean the rationale of the ALJ's decision, [such that] the ALJ's failure to discuss [this factor that was] not relevant to his credibility determination does not require remand."  *Cichocki*, 534 F. App'x at 76.

It was therefore not error for the ALJ to find that Plaintiff's testimony regarding the limiting effects of her pain and impairments was not entirely credible.  Her testimony was contradicted by the record as a whole (*see also* n.4, *supra*) and the ALJ's finding was supported by substantial evidence.  *See, e.g., Campbell* v. *Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order); *Kennedy* v. *Astrue*, 343 F. App'x 719, 721-22 (2d Cir. 2009) (summary order).

## CONCLUSION

Again, the Court notes that the ALJ's decision may have been substantively correct, but the process by which he arrived at the decision was flawed.  Because of the criticality of Dr. Taveras's opinion to Plaintiff's claims for SSI and DIB, the ALJ was obligated to seek out evidence to resolve the seeming contradiction in Dr. Taveras's statements, rather than reflexively to discount Dr. Taveras's opinion as unworthy of reliance.  For all of the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED; the

Defendant's motion for judgment on the pleadings is DENIED.  The Clerk of

Court is directed to terminate all pending motions, adjourn all remaining dates,

and close this case.

    SO ORDERED.

Dated:  September 29, 2016
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge